IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISON
Civil Action No.: 3:24-cv-828-KDB-SCR

| | |
|---|---|
| STACY CARPENTER LEMASTER, ) | |
| ) | |
| Plaintiff, ) | **FIRST AMENDED COMPLAINT** |
| ) | |
| v. ) | **JURY TRIAL DEMANDED** |
| ) | |
| BERRY GLOBAL, INC, and CHRIS ) | |
| TACKETT, ) | |
| ) | |
| Defendants. ) | |

## INTRODUCTION

1. For twenty-eight years, Plaintiff Stacy LeMaster ("Stacy" or "Plaintiff") loyally served Berry Global, Inc. ("Berry Global" or "Defendant"), formerly AEP Industries. Stacy was hired in 1995 at the Matthews, North Carolina Plant (the "Plant") as a Customer Service Manager and worked her way up to Logistics Manager. Over fifteen years of exceed expectations evaluations, laud Stacy as hard working, committed and highly capable. Her success as a leader was further confirmed by her department consistently having the lowest turnover and best attendance rates in the Plant. Aside from the Human Resources Department, Stacy was the sole female manager in the Plant and the leader with the most years of service.

2. When Chris Tackett (hereinafter "Tackett") was promoted from Operations Manager to Plant Manager in or around March 2022, he should have been grateful to have a proven leader in Stacy on his leadership team. Instead, he treated her like an unwanted stepchild. While Tackett regularly met with his male department leads and accompanied them on walk throughs of their departments, he had scant time for Stacy. Tackett even prioritized their requests for resources over Stacy's. When Tackett bothered to turn

his attention to Stacy, he was preoccupied with her retirement plans, despite Stacy reiterating multiple times that she had no near-term plans to retire. In fact, Tackett coddled poor performing male managers.

3. If her age and sex were strikes one and two against Stacy with Tackett, her commitment to health and safety was strike three. To be blunt, Tackett appeared determined to make a name for himself by abruptly shifting the Plant's productivity, even if that meant running roughshod over employee health and safety. Prior to Tackett's promotion, employees were required to directly enter safety related information (good or bad) in the Berry's GDC computer system via terminals in the Plant at least monthly. After Tackett, he issued paper forms for the employees to complete and required the employees to submit them to their Department Managers, not to corporate via the terminal as was the past procedure. He then informed Department Managers he made the change in order to control the flow of information to corporate and had the Department Managers audit the cards to downgrade the severity of safety issues reported.

4. Stacy repeatedly confronted Tackett about health and safety concerns. For example, on or about August 2022, Tackett attempted to pull Logistics employees to run the production line. Stacy expressed in management meetings that thrusting untrained employees onto a production line was an accident waiting to happen. Similarly, forklifts operating in warehouses are inherently dangerous and even more so when operating in dark conditions, as was the case in Warehouse F. Stacy confronted Tackett about the hazard posed by the darkness in Warehouse F and requested lighting be replaced, but Tackett did not approve the work orders. Stacy also complained to Tackett about plastic scrap strewn around the warehouse's lanes and inadequately wrapped pallets creating injury hazard for her employees. He again refused to intervene. Tackett also blew off Stacy's reports of improper disposing of resin that was hazardous to employees and the environment alike.

5. The only "action" Tackett took in response to Stacy's complaints were retaliatory. In December 2022, the day before Stacy was scheduled for surgery, Tackett issued Stacy a startling "Needs Improvement" performance evaluation, the first negative evaluation of her career. Then on January 27, 2023, Tackett terminated her for a problem that was ultimately the responsibility of the male Production

Manager. In Tackett's plant, there was one set of rules for young and male managers who did not make waves about health and safety problems, and another set of rules for Stacy.

6. Berry Global has been given every opportunity to amicably resolve the dispute with Stacy but continues to circle the wagons around Tackett. Accordingly, Plaintiff asks this Court to order Defendant to make Stacy whole for her harms and losses under causes of action: (i) North Carolina Retaliatory Employment Discrimination Act ("REDA") (Count I), (ii) Wrongful Discharge in Violation of North Carolina Public Policy (Count II), (iii) Intentional Interference with Contract (Count III) against Tackett individually, (iv) violations of the Age Discrimination in Employment Act ("ADEA") (Count IV); and (v) violations of Title VII of the Civil Rights Act of 1964 ("Title VII") (Count V).

## PARTIES, JURISDICTION, AND VENUE

7. Plaintiff is a resident of Union County, North Carolina.

8. Berry Global is a Delaware Corporation with its principal place of business in Evansville, Indiana.

9. Plaintiff was employed by Defendant Berry Global, Inc. and worked at its Plant located at 303 Seaboard Drive, Matthews, North Carolina 28104.

10. Defendant Chris Tackett worked at Defendant's facility in Matthews, North Carolina and resided in Union County during the operative events in this Complaint.

11. Plaintiff seeks damages in a sum sufficient that subject matter jurisdiction is properly vested in the Superior Court division pursuant to N.C. Gen. Stat. § 7A-243 *et seq*.

12. Venue is proper in this Court pursuant to N.C. Gen. Stat. § 1-82.

## FACTS

13. Stacy grew up in a family that believed in hard work and loyalty. Her father set a resounding example for dedication working as a truck driver for the same company for thirty-eight years.

Growing up in rural North Carolina, Stacy's parents pushed her to go to college, and she became a first-generation college graduate from Appalachian State University. Stacy's parents instilled in her a set of values: "Be Reliable, Do Your Best, and Your Word is Bond."

14. On October 30, 1995, Berry's predecessor, AEP Industries, hired Stacy as a Customer Service Manager at the Plant. In 1998, Stacy earned a promotion to Logistics Manager, where she received years of glowing reviews, and yearly pay increases. In fact, Stacy was a model employee; AEP Industries slotted her on "transition teams" as new entities were acquired so that her processes and procedures could be duplicated at the new facilities.

15. In 2016, Berry acquired AEP Industries. Once again, Berry selected Stacy and two other Logistics Managers, to integrate the AEP plants to the Berry systems.

16. In March 2017, Stacy was promoted to Regional Logistics Manager. This promotion expanded her purview to two additional plants in Griffin, Georgia and Montgomery, Alabama.

17. Every objective indicator from repeated promotions to decades of stellar evaluations, indicated that Stacy was on track to retire from Berry on her own terms and timeline.

18. Stacy's career trajectory reversed after Tackett was promoted from Operations Manager to Plant Manager on or about March 1, 2022.

**A. Tackett' Exhibits Preferential Treatment Toward Men.**

19. From the start of Tackett's tenure as Plant Manager, he treated Stacy differently than her male and substantially younger colleagues. He would take them out to dinner, celebrate their birthdays in the office, and regularly spent time meeting with them, which were courtesies he did not afford her. Similarly, Tackett ignored Stacy's requests for operational needs to effectively run her department, while her male colleagues' requests were prioritized.

20. After his promotion, Tackett made multiple comments inquiring when she was going to retire, even after she attempted to dispel the notion with him.

21. Tackett even treated her differently when it came to flashing his temper. By way of background, Stacy religiously took her lunch break from twelve p.m. to one p.m. However, Tackett

seemingly deliberately scheduled meetings during Stacy's lunch hour. When that occurred, she typically requested that the meeting be pushed back, as was her right under Company policy. On October 18, 2022, Stacy returned from lunch and noticed Tackett scheduled a meeting during that time. Realizing she missed the meeting, she went to find Tackett. He pulled Stacy into the Human Resources Office with HR Manager Patty Carlson. Tackett was visibly furious; he turned beet red, body shaking with rage, clenched fists, and yelled with such force spit spewed through his lips. He threatened Stacy by reminding her that she was "lucky to have a job." Ms. Carlson witnessed the tirade and froze. Later that week, Stacy talked to Ms. Carlson about Tackett's behavior. Ms. Carlson apologized to Stacy repeatedly for not intervening to defuse the situation. Stacy told Patty that she believed Tackett was treating her differently because she is a woman, but it does not appear that Ms. Carlson conducted any investigation.

22. In truth, Tackett had no problems with managers missing meetings, if they were male. For example, on October 26, 2022, David Gray, the Quality Control Manager, missed a morning meeting and was not reprimanded. On October 27, 2022, there was a mandatory Environmental Health and Safety Operations Meeting scheduled; however, only Stacy; Safety Manager Matthew Thorton and Tackett attended. Upon information and belief, the other managers were not reprimanded for missing the meeting. Tackett also cancelled meetings without informing Stacy. For example, on November 1, 2022, a Food Safety Meeting was scheduled but when Stacy arrived, no one was there. Similarly, on November 2, 2022, Stacy arrived to an empty room for a Best Practices Framework Meeting. Yet, when it came to Stacy, her attempt to adjust meeting schedule to permit a lunch break was cause for a volcanic eruption with Tackett.

23. Tackett was also lenient with poor performing male managers. Kyle Josey was the Inventory Control Manager from approximately five years. Mr. Josey's struggles in the role were apparent to many. He oversaw rudimentary inventory control practices that left the plant vulnerable to running out of resin supply. Under his leadership, the Plant ran out of shipping boxes, cores and resin. Nevertheless, Tackett elected to demote Mr. Josey to Inventor Control Specialist, rather than terminate him. And when Mr. Josey demonstrated he lacked loyalty to Berry Global by asking to be laid off rather than continue working in the lesser role in November 2022, Berry Global rewarded him with a severance package.

### B. Stacy Confronts Tackett on Numerous Health and Safety Issues.

24. By all accounts, Tackett was on a mission to make a name for himself in his first foray as a Plant Manager by drastically increasing plant productivity, with health and safety a seeming afterthought at best. And to be blunt, Stacy's leadership style and ethics were not okay with disregarding health and safety.

25. That Tackett made a deliberate decision to deprioritize safety is made plain by his dismantling of the GDC system in late spring, early summer 2022. The GDC system allowed employees to submit health and safety reports electronically, with higher rated reports going straight to corporate. Tackett instructed managers that employees not to use the terminal entry and instead complete hard copy submissions that went directly to department managers, not corporate. Worse yet, he instructed Department managers to "downgrade" high risk reports to control the flow of information. Stacy challenged Tackett on the change asserting that her employees should be permitted to utilize the system as designed.

26. In on or about August 2022, Tackett wanted to pull employees from other departments, including Stacy's Logistics Department, to run the production line without waiting for the employees to be properly trained. Stacy expressed in management meetings that employees who did not receive the required safety and production training, per Berry policy, would be unsafe on the production floor, but Tackett ordered them dispatched anyway.

27. Stacy also raised concerns in morning management meetings about lights being out in the F warehouse in the Plant. The F Warehouse had become dangerously dark because approximately fifty percent of the lights were out. Forklifts operate in this warehouse and Stacy recognized that inadequate lighting was incredibly dangerous causing unsafe working conditions that could seriously injure or kill a worker. Stacy also reviewed the lighting issue with Bob Dannen in connection with the "Go Live for The Core" Consignment program, which was sourced out of F Warehouse. Despite Stacy's efforts to escalate and remedy the lighting issue, the lights were not replaced, and the hazardous working conditions continued.

28. Also in 2022, Stacy reported to Tackett and the management team how plastic scrap was being poorly stacked in and staged in Warehouse C. Stacy detailed how entry aisles, including fire exit doors, were being blocked by the forklift drivers dumping the plastic scrap haphazardly. Stacy repeatedly sent pictures to Tackett, Production Manager, and Safety Manager detailing the ongoing issues (Exhibit A). Again, Tackett failed to take the necessary corrective action to remedy the safety issues.

29. Stacy reported and submitted maintenance requests for the warehouse door situated outside of the Logistics Office and the door to the Logistics Office because both would not lock. The Plant was required to take an Active Shooter Class. One of the training instructions was to hide behind a locked door., Stacy's employees rightly complained to her about not having locked doors to hide behind. Stacy repeatedly escalated these safety concerns and completed the necessary work orders, but Tackett and Berry failed to remedy the issues with the doors.

### C. Plaintiff is assigned additional responsibilities and uncovers additional health and safety issues.

30. In October 2022, Stacy was assigned additional duties due to the demotion of the Inventory Manager, Mr. Josey.

31. Upon taking on these responsibilities, Stacy noticed additional health and safety concerns.

32. Stacy discovered that the "PIB Tank", an open-air tank that contains resin pellets, was filling with water and overflowing onto the ground and ultimately into the sewer system. Employees were required to enter the tank and manually clear the blockages that caused the overflow. Clearing these blockages was unsafe due to the PIB tank being wet and slippery. Stacy reported these conditions to Tackett and advocated for a cover for the tank, which had already been quoted. Time and time again, Tackett told Stacy that "it was on the list" but failed to take the required action to remedy the unsafe conditions.

33. In October 2022, Stacy also discovered that the Plant was disposing of resin in garbage dumpsters and letting it overflow onto the ground (Exhibit B). This practice was against company policy, which required scrap resin to be labeled and disposed of properly to prevent it from going to landfills or waterways. Stacy sent pictures to Tackett, who failed to address the issue.

34. On or about the end of October 2022, Mr. Josey threw a rock at a silo to measure it. The rock bounced off the silo and impacted Mr. Josey's forehead, resulting in a large goose-egg. When Stacy asked the Safety Manger, Matthew Thorton, if he entered a report, Stacy was told that a report would not be entered.

### D. Retaliation Follows Swiftly with a Historically Bad Evaluation.

35. On December 1, 2022, Tackett issued Stacy a "Needs Improvement" performance review. This was the first negative performance review Stacy had received in over 27 years of employment. He refused to go over any of the details.

36. In a follow up meeting later that month, Stacy pressed Tackett on why a "Needs Improvement" evaluation had been issued. Tackett stated that Stacy was not a team player. Stacy provided a list of examples of the contributions she had made to the team and to the Plant. Stacy also reminded him of a Cost Savings Project she implemented that saved the Plant, writ large, a significant amount. Stacy asked how she could improve. Tackett vaguely responded that Stacy should call the other managers and ask if they needed help.

### E. With Mr. Josey's exit, additional duties are re-assigned between Plaintiff and Ryan Eubanks.

37. Upon information and belief, on November 3, 2022, Mr. Josey requested to be laid off from his demoted role. Subsequently, there was a review of Mr. Josey's job duties over boxes, cores, and resin. Stacy absorbed Mr. Josey's responsibilities for boxes and cores, but she had no experience ordering resins. Ordering resins is much more complex because it primarily comes in via railcar. Moreover, these orders are expensive and have the ability to shut down the plant since resin is the main ingredient for the Company's end products. Additionally, the Plant had an antiquated method for measuring resin that made the ordering prone to mistakes, not to mention worker injury. For those reason, ordering resins was assigned to Production Manager Ryan Eubanks, who, unlike Stacy, had been trained on the process and had ample experience performing the task. Mr. Eubanks had been monitoring Mr. Josey's ordering of resin when he struggled with the task as Inventory Control Manager.

38. On December 15, 2022, Stacy reported many of the aforementioned concerns to Mr. Dannen.

39. In or about late December 2022, Tackett began pressuring Stacy to take on ordering resin from Mr. Eubanks. Despite deep reservations, Stacy agreed to begin cross training with Mr. Eubanks, and she would ultimately assume the responsibility on an interim basis until Mr. Josey was replaced, <u>but only once she was fully trained</u>. Unfortunately, Stacy's training with Mr. Eubanks was sporadic and incomplete due to his consistently being called away by Tackett and the Production Department. Making matters worse, there was no formal documentation or standard operating procedures for ordering resin at the Plant.

40. During this training process, Stacy and Mr. Eubanks made orders together. When placing a resin order, Mr. Eubanks and Stacy would meet to review the needs of the Plant, after a consensus was met, they would email the railroad and place the order for resin cars. At no point was Stacy the sole decisionmaker or solely responsible for ordering resin.

41. On January 23, 2023, a mere three weeks into Stacy's incomplete training, the railroad failed to make a scheduled delivery due to repairs in Indian Trial, NC. To be clear, the order was made, the railroad failed to deliver and failed to proactively notify the Plant of the problem.

42. On January 27, 2023, Ms. Carlson and Tackett informed Stacy that she was being terminated. Tackett refused to give her a reason but Berry Global has since asserted that Stacy was terminated for the Plant running out of resin. Upon information and belief, Eubanks was not held accountable, demoted, or terminated as a result of the failed resin delivery. Upon information and belief, the Plant has since run out of resin and the male employee handling resin ordering since Stacy's wrongful termination has not been demoted or terminated.

43. On July 25, 2024, Plaintiff filed her EEOC Charge (alleging violations of the ADEA and Title VII) within 180 days of being terminated.

44. On September 23, 2024, the EEOC issued Plaintiff a Notice of Right to Sue ("NRTS") for the aforementioned charge. Plaintiff filed this First Amended Complaint adding the ADEA and Title VII claims within 90 days of her receipt of the NRTS.

## LEGAL CLAIMS

### COUNT ONE

*Retaliatory Employment Discrimination Act*

45. The allegations contained in the foregoing paragraphs are incorporated by reference herein.

46. Defendant was a "person" who employed Plaintiff under The North Carolina Retaliatory Employment Discrimination Act, N.C.G.S. § 95-241 ("REDA").

47. REDA prohibits employers from taking retaliatory action against an employee if they "[f]ile a claim or complaint, initiate any inquiry, investigation, inspection, proceeding or other action, or testify or provide information to any person with respect to" the Workers' Compensation Act, N.C. Gen. Stat. § 97-1 et seq. or the Occupational Safety and Health Act of North Carolina ("OSHA"), N.C. Gen. Stat. § 95-126 et seq. See N.C. Gen. Stat. Ann. § 95-241(a). Retaliatory action includes, but is not limited to: discharge, demotion, retaliatory relocation of an employee, or other adverse employment action taken against an employee in the terms, conditions, privileges, and benefits of employment.

48. Plaintiff engaged in protected activity by "providing information" and "complaining" about issues she believed in good faith were hazardous or dangerous working conditions at the Plant to Mr. Tackett (the highest-ranking management official), to Defendant's consultant, Mr. Dannon, and to Human Resources.

49. Defendant violated REDA by taking adverse actions against Plaintiff because of her protected activity under REDA.

50. Plaintiff exhausted her remedies under REDA by filing a charge with the NCDOL within 180 days of her termination and by initiating this legal action by filing this complaint within 90 days of receiving a right to sue letter from the NCDOL.

51. As a proximate result of Defendant's conduct, Plaintiff has suffered damages including, but not limited to: lost wages and benefits, damage to reputation, diminished earning capacity, emotional distress, humiliation, anxiety, medical expenses, consequential damages and other compensatory damages

in a sum sufficient that subject matter jurisdiction is properly vested in the Superior Court divisions pursuant to N.C. Gen. Stat. § 7A-243.

52. Defendant's actions were done in bad faith and in a manner that demonstrates an unreasonable and reckless disregard for Plaintiff's rights such that treble damages are appropriate.

## COUNT TWO

### (Wrongful Discharge in Violation of North Carolina Public Policy)

53. The allegations contained in the foregoing paragraphs are incorporated by reference herein.

54. The public policy of the State of North Carolina, as set forth in REDA, prohibits employers from taking retaliatory action against an employee who reports safety as set forth in REDA.

55. The public policy of the State of North Carolina, as set forth in the North Carolina Retaliatory Employment Discrimination Act, N.C.G.S. § 95-241 ("REDA"), prohibits employers from taking retaliatory action against an employee who, in good faith files a claim or complaint, alerts their employer that they intend to file a complaint, initiates any inquiry, investigation, inspection, proceeding or other action with respect to Chapter 97 of the General Statutes, which governs the administration of worker's compensation.

56. Defendant violated these public policies by terminating Plaintiff because she engaged in protected activity under REDA.

57. The public policy of the State of North Carolina, as set forth in the Equal Employment Practices Act, N.C. Gen. Stat. § 143-422 *et seq.*, prohibits employers from discriminating against employees on the basis of their sex and/or their age.

58. Defendant violated these public policies by terminating Plaintiff because she is a woman and due to her age.

59. As a proximate result of Defendant's conduct, Plaintiff has suffered damages including, but not limited to: lost wages and benefits, damage to reputation, diminished earning capacity, emotional distress, humiliation, anxiety, medical expenses, consequential damages, and other compensatory damages

in a sum sufficient that subject matter jurisdiction is properly vested in the Superior Court divisions pursuant to N.C. Gen. Stat. § 7A-243.

60. Defendant's actions were done maliciously, willfully, or wantonly and in a manner that demonstrates a reckless disregard for Plaintiff's rights. Defendant's officers, managers, and directors participated in and condoned the conduct described above. As a result, Plaintiff is entitled to recover punitive damages from Defendant pursuant to N.C. Gen. Stat. § 1D-15 in an amount sufficient that subject matter jurisdiction is properly vested in the Superior Court division pursuant to N.C.G.S. § 7A-243.

## COUNT THREE

### (*Intentional Interference with Contract against Defendant Tackett*)

61. The allegations in the foregoing paragraphs are incorporated by reference herein.

62. Plaintiff had a valid employment at will contract with Defendant Berry Global.

63. Defendant Chris Tackett with malice and for a wrongful purpose orchestrated the termination of Plaintiff's at will employment contract. Specifically, Defendant Tackett retaliated against Plaintiff for repeatedly opposing and reporting health and safety violations he deliberately allowed to persist at the Plant since becoming Plant Manager. Additionally, Defendant Tackett demonstrated a bias against Plaintiff because she is a woman and orchestrated her termination based on that malicious and wrongful purpose as well.

64. As a proximate result of Defendant Tackett's wrongful conduct, Ms. Plaintiff has suffered lost income and fringe benefits, lost retirement benefits, diminished earning capacity, damage to reputation, consequential damages, and other damages, and is entitled to recover compensatory damages in an amount sum sufficient that subject matter jurisdiction is properly vested in the Superior Court division pursuant to N.C. Gen. Stat. § 7A-243.

65. Defendant Tackett's actions were done maliciously, willfully, or wantonly, and in a manner that demonstrates a reckless disregard for Plaintiff's rights such that Plaintiff is entitled to punitive damages against him.

## COUNT FOUR

### (*Violations of the Age Discrimination in Employment Act*)

66. The allegations contained in the foregoing paragraphs are incorporated by reference herein.

67. Defendant employed more than twenty (20) employees during the relevant period.

68. Defendant violated the ADEA by terminating Plaintiff because of her age.

69. Plaintiff is covered under the provisions and protections of the ADEA because she is over 40 years old.

70. The aforementioned paragraphs evince shows that had Plaintiff been substantially younger she would not have been terminated. Objectively speaking, Plaintiff had an exemplary employment record and vastly more experienced than other substantially younger employees who were not ultimately displaced.

71. As a proximate result of the Defendant's conduct, Plaintiff has suffered lost income, diminished earning capacity, future lost wages and benefits, emotional distress, anxiety, humiliation, expenses, reputational harm and consequential damages in an amount sum sufficient that subject matter jurisdiction is properly vested in the Superior Court division pursuant to N.C. Gen. Stat. § 7A-243.

72. Defendant knew or showed reckless disregard for whether its actions violated the ADEA. Plaintiff is entitled to recover liquidated damages in an amount sum sufficient that subject

matter jurisdiction is properly vested in the Superior Court division pursuant to N.C. Gen. Stat. § 7A-243.

## COUNT FIVE

### (*Violations of Title VII of the Civil Rights Act of 1964*)

73. The allegations contained in the foregoing paragraphs are incorporated by reference herein.

74. Defendant employed more than fifteen (15) employees during the relevant period.

75. Defendant violated Title VII by terminating Plaintiff because of her sex and in retaliation for her reporting sex discrimination.

76. The aforementioned evidence shows that had Plaintiff been male or had she not reported discrimination, she would not have been terminated. Objectively speaking, Plaintiff had an exemplary employment record and vastly more experienced than other male colleagues and colleagues who did not engage in protected activity who were not terminated.

77. As a proximate result of the Defendant's conduct, Plaintiff has suffered lost income, diminished earning capacity, future lost wages and benefits, emotional distress, anxiety, humiliation, expenses, reputational harm and consequential damages in an amount sum sufficient that subject matter jurisdiction is properly vested in the Superior Court division pursuant to N.C. Gen. Stat. § 7A-243.

78. Defendant knew or showed reckless disregard for whether its actions violated Title VII such that Plaintiff is entitled to recover punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests the Court:

A. Enter a judgment against Defendant to pay Plaintiff compensatory damages;

B. Award Plaintiff the greater of liquidated (ADEA) treble (REDA) or punitive damages (Title VII);

C. Award Plaintiff all reasonable costs and attorney's fees incurred in connection with this action, including prejudgment interest;

D. Award Plaintiff such other and further equitable relief as the Court deems appropriate under the circumstances, including front pay.

## JURY TRIAL DEMANDED

Plaintiff hereby respectfully demands a trial by jury of the allegations contained in this Complaint.

This the 31st day of October 2024.

*(signature)*

Joshua R. Van Kampen (NC Bar No. 32168)
Van Kampen Law, PC
315 East Worthington Avenue
Charlotte, North Carolina 28203
Phone: (704) 247-3245
Email: josh@vankampenlaw.com
*Attorney for Plaintiff*